The last case for argument is In Re. Xencor No. 24-1870. Ms. Goldenberg, when you're ready. May it please the Court. Xencor invented modifications to an anti-C5 antibody's constant region that increase in vivo half-life, meaning antibodies stay in the body longer. The invention is not a cure for anything. Instead, the invention allows for less frequent administration, regardless of the reason for the administration. Turning first to Claim 9, the Board construed the treating of patient language in the preamble as limiting. Can I ask you, before we get to that, is there a dispute as to whether the claims cover all types of diseases and conditions, or you accept that that is the breadth of your claims? So, we don't think that that is a requirement of the claims, but we accept the fact that the claims could be used in administration for any purpose, including diseases or for research purposes. The Board clearly understood your claims as that broad, correct? Correct. That's correct. And you've not disputed that for purposes of this appeal, is that right? We dispute that that is a requirement for terms of written description. It's just a use. It's the utility that the claims could be applied in, an application or a purpose. But the claims themselves are directed to the improvements in the constant region of the antibody. Do we have to think about whether, if we ordered that you get these claims, that you'll say they read on using these, practicing these methods in connection with absolutely any disease or condition under the sun? So, these claims, you would only be practicing these claims if you made these specific substitutions in the antibody's constant region. This is not naturally occurring. You have to engineer the antibody. So, under our interpretation of the claim, whatever you're doing with it, whatever the purpose of your administration, whether it be to cure an inflammatory disease or to inject it into a mouse for research purposes, if you go in and make those specific modifications in the amino acid sequences that are disclosed in this patent, then you would be infringing the claims. But we're not preventing anybody from using that same antibody without the modifications and curing any disease that they want to. They'd have to make that choice. They want the benefit of the invention, which is increased in vivo half-life, which provides a tremendous benefit. It's less frequent dosing for someone who might be receiving treatment or for someone who's in the lab and giving this to a monkey. You don't have to use as much, and you don't have to do it as frequently. So, if they want to take advantage of that invention, which is undisputably what we disclosed in the written description here, they would be practicing the claim, but they don't have to administer an antibody. So, I appreciate all that. I think one of the reasons the board rejected these claims, though, is that they then said you need to have written description support for using this with all types of, or at least more types of diseases and conditions than you actually provided written description for. Is that, in fact, part of what you understand to be the reasoning that was given for why you didn't get these claims? Yes, that is correct. So, why is that wrong, then? If you look at Alcon research, I think that's a great example as to why that approach to written description is wrong. In that case, there was similarly a claim that just improved something. It was a method of enhancing the chemical stability of an aqueous composition comprising a therapeutically effective amount of a prostaglandin. The chemical stability was enhanced by using a certain amount of a castor oil. That was the invention. And in that case, the analysis of written description focused on the inventor's possession of the improvement, which was whether the castor oil stabilized the prostaglandin drug. And the court actually reversed the district court, which had held that there wasn't written description, saying that the Alcon research patentee wasn't required to describe every therapeutically effective prostaglandin drug for every patient in every condition. It was a narrow claim. It was directed to an improvement. The prostaglandin drugs become more stable if you use this new castor oil that we invented. Likewise here, the antibodies, if you make these modifications to the constant region in NIC5 antibodies, you're going to get longer in vivo half-life. It's not going to make the drug any more effective in treating whatever you're trying to do or if you're administering it for research purposes. You're just going to get something that's undeniably valuable and beneficial to the world. And that's exactly what the written description requirement is supposed to require. It's to ensure that the scope of the right to exclude set forth in the claims doesn't overreach the scope of the inventor's contribution to the field. And that's exactly what we've done here. We've provided written description for the invention. I do want to focus, however, on the differences between Claim 9 and Claim 8 because they do require different analysis. Claim 9 is a method claim, and the sole issue here is whether the preamble is limiting because the board construed treating a patient language in the preamble as limiting and then it required written description for the term. But that portion of the preamble is not limiting, so this court must reverse. The general rule is that the preamble is not limiting. And that general rule is all the more applicable here when we're under the broadest reasonable interpretation standard. Haven't we said, though, for methods that general rule is maybe not as generally applicable for method claims? For method claims, yes. But you haven't said it's not applicable. Just in method claims, maybe it's not as applicable as for composition claims. I'm a little confused by your argument. Both of these are method claims for treating a patient. And if we read treating a patient out, then it's just a method claim for administering the anti-C5 antibody. Is that what you think you claimed? For claim 9, yes. I want to separate out because claim 8 is a Jepson claim that comes with its own requirement. If that's the case, then what's the point of putting treating a patient in? Shouldn't it just be a method of administering an anti-C5 antibody? I mean, I'll put my cards on the table. I think our case law on preambles is nonsense and all messed up, and it should be limiting in all situations. I can't do that because we have different precedent. But when it says a method of treating a patient by administering something, and you say, well, part of that's limiting but part of it's not, what's the basis for that? It's a method claim to treat a patient. Don't you have written descriptions for treating patients, not for doing it in the lab, for administering it for other purposes, for research purposes and all that kind of stuff? That would be what you get if you just had a method of administering. What's wrong with that? So I'm not going to argue about the policy of limiting versus non-limiting because I think you understand as well that that is the world we're living in right now. So under the precedent, it's okay to say your intended purpose without that being limiting. And we use the Catalina marketing factors here. Isn't there a difference between saying the intended purpose of this invention is in a method claim, which I think is what Judge Stark was getting at? A method claim actually is telling you a method of doing X, and the method here is not administering, it's treating a patient. So as I said, that is just an intended purpose, and we do look at whether the Catalina marketing factors that are sort of directions, guideposts for us, none of them are applied here. In fact, if you look at the specification, it defines the present invention in paragraph 74 as directed to antibodies that exhibit increased binding to FCRN relative to the wild-type antibody. That supports our interpretation. And we see embodiments disclosed that include in paragraph 182 a therapeutic, a diagnostic, or a research reagent. But I hear you, Judge Hughes, and I understand that maybe you want to give meaning to method of treatment. And as we've noted in our briefs, even if you do that, the board erred. Because what they did is they required treating all patients and all diseases, and they effectively read into the claims the requirement that treatment be successful. If you eliminate that requirement, treatment doesn't need to be successful, you just have to be administering for the purpose of treatment, because we're now in the world where we're going to interpret those claims to have meaning. If you're going to do that, then there's still written description here. Because there isn't necessarily written description for successful treatment, but the specification is full of examples of administering this for therapeutic purposes, for treatment. Does the identity of who or what you're administering to change how you administer the antibody? Yes, it does. And that's actually a problem with the board's construction, with the director's proposal, because they're saying on one hand a patient can be an animal or a human. But on the other hand, if you're administering it for treating, you're not administering this to monkeys and mice for treatment. You're administering it to them because you're trying to research, you're trying to figure out whether or not we can put this in humans. So those two things can't be true at once. If the method of treating is limiting, then it necessarily has to be a human, as well as the fact that Claim 9 requires that the means for binding be the human C5 protein. So that's something you have to have, human C5 protein there. Do you think there's sufficient written description if we look at it in terms of method for treating human patients? Yes. For any possible use of this particular whatever you've claimed here? Yes. And the reason for that is because we don't need to show success. I don't care about the success. I'm just thinking it seems to me that this specific combination or these specific substitutions, your view is they can be useful for a wide variety of treatments and drugs and whatever. And do you have written description for that entire universe, or do you only have written description for certain specific things? And my answer is we don't have written description for treating all patients and all diseases. That's conceded. But we don't need it, because all we need to show— If that's what you're claiming, you need it though, right? Not if—all we have is a method of a—we have plenty of written description support for administering this for therapeutic purposes. Now, it will be up to a skilled artisan whether or not they believe that this is going to actually treat something. Anti-C5 antibodies are known to treat certain conditions, autoimmune, transplant, inflammation. They can administer that with intent to treat, and they'll have some knowledge knowing it's probably going to work. But they—we've given them enough to tell them this can be used for therapeutic purposes. We used a steel analogy in our brief, where if you invented a new type of steel, the steel is broadly applicable. It can be used for houses. It can be used for bridges. It can be used for airplanes. But you don't have to provide written description for all of those things. You can just say this is broadly useful. What if it was phrased as a method for using steel created by this process? Wouldn't you have to show all the methods, written description—assuming it's limiting, again?  Wouldn't you have to show written description support for all the different methods of using it? No, and that would be very contrary to both the purpose of the written description requirement, because now you're requiring way more than what the inventor is claiming to have contributed and claimed. And it also doesn't follow the reasoning in Alcon research. We cited the case Pharmacia and Upjohn. That was a Jepson claim, but we didn't require, for example, all micronized anti-diabetic pharmaceutical compositions to be disclosed when it was an improvement claim towards that. And I do want to touch on the Jepson claims. I hope you will get to do that. But before you get to that, on written description, it's a finding of fact, I believe, right? We review for substantial evidence what the board said about lack of written description. Isn't that correct? So the legal doctrine is a finding of fact, but here the facts are undisputed, right? I was going to ask you, are you saying there's not substantial evidence, or are you saying that the board had the wrong legal framework in mind? The board had the wrong legal framework in mind, because the facts are undisputed. We have written description for the improvement. We don't have written description for all patients and all diseases. And if I might ask, I know we're into your rebuttal, but on the Jepson, is it your position that you don't need to provide any written description whatsoever for what was supposedly well-known in the prior art? Absolutely. I mean, it's hard to make sense of that. Why isn't it? I think it's a question of first impression. Do you agree with that? This Court has never considered written description in the Jepson context. I mean, why wouldn't the correct answer be, of course you need written description for the full scope of your claim. It's just very easy most often, and maybe always, to satisfy the written description to show that you possessed the part of your invention that was already well-known in the prior art. It may be satisfied by one sentence or a reference in the background of your patent. But for us to say you don't need anything whatsoever to show that this was really actually well-known in the prior art, that would seem inconsistent with a whole lot of case law, wouldn't it? It wouldn't be inconsistent with Alcon research, which is the most analogous case that either of the parties have cited here, which is, again, it's an improvement claim where they're claiming an enhancement in stability. And this Court reversed and said there was written description because you don't need to show that the treatment was therapeutically effective for every patient in every condition. And once again, written description is a judicially made doctrine. It's something that has been developed through your cases, and the purpose, as this Court said in Ariad, is to ensure that the scope of the right to exclude doesn't overreach. Here, the invention is fairly modest. It's directed to specific amino acid substitutions in the constant region for anti-C5 antibodies, talking about the Jepsin claim specifically now. And in that case, we've shown possession of our improvement. If what you invented was this specific substitution, why didn't you just claim that rather than a method for treating patients by administering that? So this has a long prosecution history record, as I'm sure you noticed, and there were other claims that were not pursued due to examiner dislike. This seemed to be what the examiner preferred at the time. You might recall that he withdrew his written description rejections when we got to the Board, and then the Board reinvigorated them. So the Board's analysis just doesn't, it can't apply here. It doesn't make sense when you try to frame it in terms of what is the purpose of written description, and are we over-claiming? Are we asking too much? Okay, you're out of time. Did you want, you keep saying you, I can't tell if you touched on the Jepsin claim and you wanted to or not. I'll give you a minute to talk about the Jepsin if you want to, and then I'll restore some of your rebuttal. Otherwise, we can move on. Sure. Thank you, Your Honor. So I'll just add on the Jepsin claim that those claims are designed specifically to identify the inventor's contribution to the field via the improvement. We state the prior art, and then we state the improvement. This Court has at least approved Jepsin claims in other contexts without any concern of written description of what is the prior art, and it really doesn't make sense. It would basically eviscerate all Jepsin claims if you require disclosure of all of the prior art in order to have the improvement. Only the most narrow of Jepsin claims would survive. And the Board relies, the Board and the Director rely on both Juneau and Boston Scientific and just sort of mechanistically apply their reasoning without thinking what is the purpose of written description. With Jepsin claims, we have a gist. We have a heart of the invention. And the question here should be did we provide written description for that? And I think the answer is unquestionably yes. So I thank you, Your Honor. We'll restore your three minutes of rebuttal. Thank you. Good morning, and may it please the Court. Peter Sollert on behalf of the USPTO Director. What we have here is an example of a patentee using novel approach to antibody claiming and taking the unusual step to use Jepsin and means plus function forms to push the boundaries of antibody claims. But the fundamental problem here is that ZEN-COR's reach exceeds its grasp. The claims are far broader than what has been disclosed, and this is a violation of the agreement with the public for any patentee, that you must first describe and demonstrate possession of your invention before being entitled to claims to it. The ARP correctly pursued the issues in this application in two steps. First, looking at claim construction and finding that the preambles of both Claims 8 and 9 are limiting. And then finding that they are limiting, just as with any other limiting claim term, they must have adequate written description support, looking to the specification of the 690 application and finding that there is essentially no written description to support the method of treating a patient limitation that is present in both terms. Do you agree that we're to apply the broadest reasonable interpretation to claim construction in this context? That's correct, Your Honor. And so doesn't that put another sort of thumb on the scale, that the preamble here is not limiting, that the broadest reasonable interpretation of treating a patient would presumably include that it's not limiting, probably also includes that it's limiting, but we're supposed to take the broadest interpretation. That's correct, Your Honor, but the key word there is reasonable. And the claim here can't be construed reasonably without the treating a patient words in the preamble being limiting. We're already past the presumption of the preamble being non-limiting, as NCORP agrees that administering an anti-C5 antibody, which is part of the preamble, is limiting. And so now we're at the step of saying should we... Have we ever said that if we're in a case where you can splice the preamble, that there is no presumption any longer against the part that the patentee presumably says it's not limiting? Is still presumed to be not limiting? I don't believe there's a case that would say that, Your Honor. Why shouldn't we say the starting point here is that we presume generally that the things they say are not limiting, the treating a patient is not limiting. It's not the starting point. It is. I think it's more logical to take that step with the preamble as a whole and say, you know, is some of it limiting or not, you know, and start from the presumption that none of it is. But once you've kind of moved past that statement, you find part of it limiting. But I think the result is the same either way. The fundamental problem here... It would be that even if we can split it, once you accept that administering this antibody is limiting, then it has to be read in the context of administering to whom or for what purpose. So that is why treating a patient is included. I wouldn't rest it on that alone, Your Honor, because there are so many reasons here. It's because I think more persuasively as to treating a patient, we have the language in the claims that says increasing in vivo half-life. And there's no direct antecedent basis there. But one of ordinary skill in the art is going to read in vivo half-life in view of the reference to treating a patient in the preamble. They're not going to read that in isolation. And so that reinforces that treating a patient is informing the context of this claim. We're also talking about increasing in vivo half-life, and that takes context from treating the patient, right? That's the purpose in which we have to judge this result of increasing in vivo half-life. So why isn't administering enough to satisfy what you're arguing now? Well, administering is so incredibly broad that standing alone, it doesn't really do anything. It falls back into that category of numerous cases that we cited from the court of amounting to an academic exercise. Sure, you're administering this compound, but to what end? To accomplish what? Different question. The board said that the raison d'etre of the claimed method is treatment. You don't seem to be arguing that. You seem to be accepting the raison d'etre is to increase the half-life. But are you defending the board on that point, or are you not? I am defending the board on that point, Your Honor, because the only reason to increase half-life is in conjunction with treatment. That's how increasing half-life comes to have value. Because unless you're treating a patient and therefore able to lower the dosage to that patient or reduce the frequency with which the antibody has to be administered, increasing the half-life on its own has no benefit. It's just something that happens. It's not achieving any positive utility or result. And that's why, again going back to the phrase that this court repeatedly uses, you need the method of treatment to get life, meaning, and vitality into this claim. Go ahead. And once we accept that it's limiting, we can see that in the specification, there's description about how to make these modifications to the FC region. But there isn't description of using any of this huge laundry list of antibodies that are identified as possible candidates essentially for investigation of this half-life improvement. There's no description of administration or treatment. The sole reference to any anti-C5 antibody, which is what is claimed here, is in one paragraph. That's at APPX 160, paragraph 133 of the application. And it's just made in passing that there's a category of antibodies that may be useful for treatment of broad categories, like anti-inflammatory or organ transplant. And then anti-C5 is identified there in part of a long list. There's no description of what's known about administering or much less treating patients, much less all patients and all diseases. So we're nowhere near any of the cases where adequate written description was found. This is an easy case on written description. There's a response to the contention that implicitly you're taking the view that treating a limitation has a safety and an efficacy component to it, and they would insist it doesn't. I think it does have some minimal level of that component. The ARP did not put any numerical or specific requirement on it, but essentially what the ARP found is that treating is something more than administering, right? There's some beneficial, observable result. Does our case lab allow the director to read into treating a patient, safety and efficacy? So I want to be very clear about drawing the line there. It does not allow the director to draw in safety and efficacy limitations that aren't part of the claim. But this court has said that using the word treating does require some observable positive effect. And I'll even backstep that. It doesn't have to be in every single patient. We're reading this specification from the viewpoint of one of ordinary skill in the ARP. So there has to be something that's known. Treatment, by definition, has some intended result. We don't have to specify what that intended result is, just what the claim itself would express as the intended result. Yes. But knowing that there is some understanding in the ARP of what treatment is, and that there has to be something to satisfy the person of ordinary skill in the ARP, that the inventors here possessed the invention, which is not just the change to the FC portion of the antibody, but that as applied to the antibody and used for treatment. I'll take it to Jexson questions.  Zencore argues that the Patent Office has never contested that they possessed and provided adequate written description of the improvement in their claims. Is that correct? That's correct, Your Honor. Okay. And you agree it's a question of first impression as to whether or not in a Jexson claim you have to provide written description for what was supposedly well-known in the prior ARP? We've never taken a view on that, is that right? Not explicitly, Your Honor. All right. So what is your best argument as to why in a Jexson context, I'm generally talking about claim eight here, when we have it just at the invention, we know what they're claiming is inventive, why do they have to also give written description for whatever is well-known in the prior ARP? Yes, Your Honor. I think this Court has made every ruling right up to the point of the one that you said, you know, about explicitly stating that a Jexson preamble has to have written description just like any other claim element in any claim, because the Court has said a Jexson preamble is part of the claim and it's limiting. The Court has also separately said everything in the claim that is limiting has to have written description. It doesn't matter if it's not the novel part. It doesn't matter if it's the known part. It has to have adequate written description. And we can see that there's no huge burden from your question to counsel earlier that, depending on how well-known something is in the prior ARP, the description that's required may be minimal. But you still have to have, under this Court's case law, it can't just be something that's obvious or apparent to one individual. Is there a reason why you would have us say there is a written description requirement for what's well-known in the prior ARP, that there could be a dispute as to what's well-known in the prior ARP? And, you know, maybe the patentee might, you know, think something's well-known in the prior ARP, but in the light of day, during fact-finding, you'll determine it wasn't actually well-known. Is that one of the reasons? I'm not sure that that has an impact at the infringement stage. What we're talking about here, the fundamental bargain, or the fundamental requirement of written description, is that the patentee, the putative inventor, has to establish that they, to one of ordinary skill in the ARP, that they possessed the invention. And a Jepson claim is something in the prior ARP with an improvement. So the something in the prior ARP is part of the invention. It's not the improvement standing alone. It's the improvement as applied to something specific. So you have to show you knew about that part, too. That's where I get confused, because normally, to be a person of ordinary skill in the ARP, at least implicitly, we assume you're familiar with the prior ARP. It would be hard to imagine being qualified as a person of skill in the ARP if you don't already bring to the patent process knowledge of what's well-known in the ARP. Would you agree with that? That's true, but you can't simply assert that something is well-known in the ARP and make it true. You have to show that. Can I ask you a hypothetical? Absolutely. So let's assume we have a Jepson claim where it's an improvement to a car. And let's take it back 20 years before any kind of electric vehicle was ever known. So when you're writing the Jepson claim and it's an improvement for the braking system or a passenger vehicle, how much written description support do you have to have for a car? Not much, right? Everybody knows what a car is. Do they have to have written description support for both an electric? Like say we get, you know, a little bit later, did they have written description support for an electric car versus a gas car or the braking system? Does that matter? I'm not sure, Your Honor. I'm not either, that's why I asked. I'm just inquiring about the extent of, because it does seem to me like it has to be some type of sliding scale. In this one, do we know that people of skill in the art knew of administering this antibody for all of these different purposes? I don't know. I don't see a lot of explanation in the record that somebody of skill in the art would have known that you could use this for a whole bunch of things. But assume they did, then why wouldn't the specific improvement be, you know, the one you really had to show written description support for, and all you had to do was make a nod to the fact that somebody skilled in the art would know all this. I mean, maybe that's the problem here is there's no evidence to show that a skilled artisan would know how to use this Right, Your Honor. So let me answer that in two parts. One is sort of, I think there is sort of a sliding scale because not all technologies are the same. And I apologize, I can't remember the name of the case off the top of my head, but there was a case from this court about a decoder, you know, in an electronic circuit. And all it said was a decoder, and then it had the name of an article with the magazine title. And there was evidence from an expert that just seeing that name and the article title was enough written description for him to recognize what that was, as a person of ordinary skill in the art. That's kind of one extreme, right? That's a lot like your car example. Maybe just saying a car is enough, depending on the particular invention involved. If it's about some specific improvement to the fuel injection system, maybe you've got to say something about what the engine looks like and not just say car. But here, we're in the antibody field. And we have an admission in this context that they didn't possess all the known area or all the known genus, all the genus of anti-C5 antibodies. And making, we also know that antibodies and biochemistry are highly unpredictable. Making a change in a single sequence can radically affect structure. So here, we have an extreme where there's no discussion of administering or treating or of the genus of anti-C5 antibodies, and yet a claim, two multiple claims, both the Jepson and the mean plus function, claiming all of that. I see that I'm over time. If I could just briefly address one point. He's going to end up with extra time, so you can go to the four-minute mark. Thank you, Your Honor. If you need to. I just wanted to briefly address counsel's reference to the Alcon research case. I think that counsel is completely misreading it. If your honors would look at the Alcon research case, which is 745F3D at 1191, this court did not just focus on the improvement of stability to the prostaglandin compound. The court's opinion states, speaking of the patent issue there, it provides exemplary formulations that embody the claimed invention, reciting concentrations of every ingredient. It also discloses data generated by the inventor from accelerated stability testing, showing the effect of PICO and prostaglandin concentration on stability and comparing the effect of PICO to that of a more commonly used surfactant, polysorbate 80. The patent also describes various classes of prostaglandins to which the invention was understood to relate, which are covered by the term prostaglandin under the district court's construction of that term. This court found lots of description about the prior art that was being improved on in that case. And I do think that this court's decision in EOI Lilly is by far the best guidance for this situation, is by far the closest set of claims and analysis. Thank you. Thank you. Thank you, Your Honor. I'd like to start where he just left off, which was with Alcon Research. So we also have an immense amount of specification support. The specification says things like this data was proved to be reproducible via repeat experiments with a variety of antigens. And earlier in the priority chain, there was a declaration that was provided of transferability. When the examiner had questioned, well, we know this is going to work across a wider variety, the inventors provided a declaration of transferability. The examiner accepted that declaration, and the issue never came up again. So we have record evidence and support for the fact that this will work broadly. And the reason why he mentioned unpredictability of antibodies, that's true, but it's true of the variable region. That's what binds to things, and that's where all these different changes occur, can affect binding. That's where all this court's case law is about. We're in the constant region. We're in the stock of the why. And here, you can consistently make these amino acid substitutions and get longer in vivo half-life. You're not going to make the antibody work better. It's not going to kill the antigen better. It's not going to kill. But what it's going to do is it's going to stay in the body longer, which is undisputably an advantage. I also want to just clarify, to the extent I implied that there was no support in the specification for treatment, I think I said the specification's full of examples of using this for treatment purposes. That's probably the primary embodiment. It's not the only embodiment. It also mentions research and other diagnostic testing. But it's full of examples, and specifically in paragraph 133, it mentions the fact that anti-C5 antibodies can be used to treat autoimmune transplant disorders and inflammation. And that's what was known about anti-C5 antibodies. That's why you would administer this to treat, if you have an intent to treat, would be to affect diseases of the complement system. So all of that was known and is described in the specification. I think, however, going back to what Judge Stark said about the preamble, the easiest way to address Claim 9 is just to find that it's not limiting. There's nothing wrong with splicing it. There's no court precedent that says because you find a portion of the preamble to be limiting, the rest of the preamble must, therefore, be limiting. In fact, the opposite was held in TomTom, and this case is very similar to those claims. I think we just heard for the first time that these claims don't require any safety and efficacy and that the case law doesn't require that. I think previously from the director and the board, they've read that into the claims. So if we wipe that out, even if the preamble is limiting in Claim 9, all you need to show is you're doing it for the purpose of treating. We've got that in the specification. We don't need to show that it's going to be effective or for all diseases and all purposes. So unless the court has any other questions. Thank you. Thank you. Case is submitted.